United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOHEMI LAZCANO,<br><br>Plaintiff,<br><br>v.<br><br>JOHN E. POTTER, IN HIS OFFICIAL CAPACITY AS POSTMASTER GENERAL,<br><br>Defendant. | No. C 05-03396 WHA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

In this employment-discrimination case, the government has made an omnibus motion for summary judgment on all claims. This order finds that genuine issues of material fact exist as to plaintiff's claims of disability discrimination, hostile work environment, and retaliation. Accordingly, for the reasons stated below, the government's motion for summary judgment is only **GRANTED IN PART** and otherwise **DENIED**.

## STATEMENT

On summary judgment, the facts must be taken as presented by the nonmoving party. Since 1986, plaintiff Nohemi Lazcano was an employee of the United States Postal Service at its facility in El Cerrito, California. She began her employment there as a city carrier. After 1999, she was a modified city carrier (Lazcano Decl. ¶ 2). Lazcano alleges that she was discriminated against because of a disability and because of her sex.

The primary alleged perpetrator was the postmaster, Jack Boster. Boster was Lazcano's supervisor in El Cerrito between 1995 and 1998. Boster was transferred to another office in 1999 but returned to the El Cerrito Post Office as postmaster in March 2003. Boster left his position in 2005, when he was relocated to another facility (Lazcano Decl. ¶ 14).

In June 1993, Lazcano was diagnosed with bilateral carpal tunnel syndrome. Because of this condition, Lazcano had difficulty with many day-to-day activities, including brushing her hair, brushing her teeth, using the telephone, eating, and driving. When he was her supervisor, Boster "frequently harassed" Lazcano about her carpal tunnel syndrome. He constantly asked her to see doctor's notes to account for her absences. He also threatened to "AWOL" her if she did not come to work on the day her carpal tunnel release surgery was scheduled, or so Lazcano states (Lazcano Decl. ¶¶ 3, 6, 14).

At the USPS, and at the time in question, an employee who was unable to perform job responsibilities due to medical restrictions might receive a modification of job responsibilities through a "job offer." The job offer might be generated by the supervisor alone, an injury-compensation specialist, or certain other individuals (Simmons Decl. Exh. 2 at 247–48).

In November 1999, Lazcano accepted an amended rehabilitation job offer. The job offer detailed the duties she was required to perform: deliver express mail, process no record mail, pick up collections, answer customer-service complaints, process return-to-sender mail, and pull services issues from the "POMs" computer. The "limitations" of her job offer were as follows: "You will not be required to drive a motor vehicle for more than 10 minutes at a time. You will not be required to lift, push or pull more than 15 pounds. You may change positions as comfort warrants. You must have the ability to walk into and from the building in addition to the above restrictions" (Warney Decl. Exh. 1).

Plaintiff's job duties were further altered in March 2001 and again in March 2003. The 2001 job offer was essentially the same as the 1999 job offer but expanded her duties to include vending-machine duties and registry-cage duties. Her March 2003 job offer eliminated the vending-machine, registry-cage, and return-to-sender duties. "Delivery confirmation" duties were added (Warney Decl. Exhs. 2, 3).

2

Boster returned to the El Cerrito Post Office as postmaster in March 2003. Immediately upon his return, Boster allegedly began engaging in sexually demeaning conduct directed at Lazcano. He frequently propositioned her to have a relationship with him. On multiple occasions, he suggested that Lazcano find work at another post office so they could pursue a relationship. About three times in May 2003, Boster gave Lazcano resignation forms to fill out so she could resign from El Cerrito so they could date. She continually refused his advances (Lazcano Decl. ¶¶ 18, 19).

In 2003, video cameras were installed at the El Cerrito Post Office. They fed video to screens in Boster's office. Boster told Lazcano, "I want to see your fat ass on that camera at all times." Lazcano alleges that if she was not visible on camera because she had moved out of its range, Boster would come out of his office to look for her. From March until June 2003, Boster called Lazcano into his office periodically, at least once every two weeks. During those times, he made Lazcano sit and wait in his office. After several minutes of silence, he would dismiss her (Lazcano Decl. ¶ 20, 21).

In April or May 2003, Boster told Lazcano that she was "useless" because she was not of "able body" and did not work fast enough. He also told her that she was of no use to him as an employee, because she could not case mail. (Casing mail involves sorting the mail, grouping it, and preparing it for delivery.) Boster told Lazcano that she needed to "sell herself" to him in order to convince him to keep her at El Cerrito. He told her, "I want you so bad I can taste it." He also told her that she was a "bad girl" who disappeared all the time. He asked if he should "spank [her] every time [she] disappear[ed]." In May 2003, Boster called Lazcano into his office and asked her to "pull down [her] pants." Later that month, he called her into his office again and asked "if [her] pu\*\*y was wet" (Lazcano Decl. ¶¶ 22–25; Shelton Decl. ¶ 2).

Boster would call Lazcano into his office frequently and ask to see under her cardigan, ostensibly to check whether she was wearing the USPS shirt. Initially, she unzipped her cardigan to show him that she was wearing the USPS shirt. He told her that he wanted to see under her sweater three or four times a week, sometimes twice a day. He also asked to see her breasts and to touch them. Boster was harassing her so much that one day in his office, she

3

relented and let him touch her breasts. She thought that if she let him, he would stop harassing her about it (Lazcano Decl. ¶ 27).

Once, in February 2004, Lazcano came to work and swiped her time card at the clock near Boster's office. He heard her clocking in and called her into his office. He told her that she was late. Boster then called Lazcano's supervisor, Linda Shelton, and told Shelton, "[Ms. Lazcano] is late, you know what to do." Boster then tried to unzip Lazcano's sweater (Lazcano Decl. ¶ 28).

In February 2004, after Lazcano had been late to work several times, Shelton called Lazcano in for a just-cause interview. The purpose of the interview was to establish the facts upon which Shelton was planning to impose discipline and to allow Lazcano to state the reasons for her poor attendance. Lazcano told Shelton that she had been late to work because of Boster's sexual harassment. Shelton terminated the just-cause interview and began a sexual-discrimination investigation. Lazcano told Shelton that she had written down notes, dates, and descriptions of the harassment and that they could be provided. Four days later, however, when the investigation into the allegations continued, Lazcano clocked out from work sick and left the post office without providing the documentation. Shelton never asked for the notes any time thereafter (Shelton Decl. ¶¶ 6–8; Lazcano Decl. ¶ 42).

Lazcano's work duties were scaled back between March 2003 and February 2004. Lazcano contends that she was being discriminated against because of her carpal tunnel syndrome. The government contends that plaintiff requested not to perform certain duties or that the duties were generally performed by others. For example, Lazcano complained that she could no longer drive to deliver express mail without hurting her wrists. According to Shelton, Lazcano was not efficient enough for express-mail delivery, so Shelton removed this duty from plaintiff. With respect to the vending machines, Boster was concerned that the vending machines were too often empty or out of order. A surprise audit was ordered, and a shortage of $46,978.45 was calculated. Another supervisor, George Chirinos, requested that management choose a technician other than Lazcano to maintain the vending machines. Chirinos also served a demand letter on Lazcano for $46,978.45. According to the government, Lazcano was rarely,

4

1  if ever, called upon to perform her other duties because those duties were the primary
2  responsibilities of other employees (Shelton Decl. ¶ 5; Chirinos Decl. ¶¶ 4–6; Lazcano Decl.
3  ¶ 59).
4      By June 2004, Lazcano's work day was reduced to sweeping, garbage collection, and
5  picking up empty equipment, which she did on her own initiative. One morning in June 2004,
6  Shelton told Lazcano to go to the break room and await further instructions. When no one came
7  to instruct her, Lazcano went to see Shelton. Shelton told Lazcano that there was nothing for
8  her to do on the workroom floor and that her presence was disruptive to other workers. Shelton
9  told Lazcano to return to the break room, where she remained for the rest of the day. Lazcano
10 was essentially sequestered in the break room through March 2005. She was occasionally
11 brought small duties by Shelton, such as highlighting other carriers' routes on a map. For the
12 majority of those days, however, Lazcano was left in the room without any responsibilities
13 (Lazcano Decl. ¶¶ 35–39).
14     Shelton would also leave Lazcano in the break room and lock the door. This would
15 happen when Shelton needed to leave for more than an hour and there was no other supervisor
16 around. Shelton would lock the padlock to the front door to the Carrier Annex, leaving Lazcano
17 alone inside the annex. Most times, Shelton did not notify Lazcano that she was leaving and
18 locking the door (Lazcano Decl. ¶ 40). At oral argument, counsel explained that Lazcano is still
19 employed by the USPS but did not identify the facility to which she is currently assigned.
20                     *        *        *
21     Lazcano initiated this action in August 2005. The parties filed several applications
22 regarding various discovery-related problems, many of them requiring court intervention. The
23 Court held three hearings and issued three orders resolving the disputes. Because of one of
24 these disputes, the government was unable to complete the deposition of plaintiff Lazcano until
25 after the deadline for filing dispositive motions had passed. The Court allowed the government
26 to file the instant motion for summary judgment two weeks late. Because Lazcano's counsel
27 was in trial, counsel was given three weeks — as opposed to the usual two weeks — to file an
28 opposition to the government's motion. A day before the opposition was due, Lazcano's

5

1 counsel filed a request for an extension of time to file the opposition. The Court granted a four-
2 day extension for the opposition and a one-day extension for the reply brief. The opposition
3 and reply briefs were timely filed according to the modified schedule.

**ANALYSIS**

Under Rule 56, summary judgment is proper where the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It is not the task of the district court to scour the record in search of a genuine issue of triable fact. The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). A genuine dispute as to a material fact exists if there is sufficient evidence for a reasonable finder of fact to return a verdict for the nonmoving party. On summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

The government filed the instant motion for summary judgment as to all of Lazcano's claims. Lazcano contends that there are triable issues of fact whether: (1) she was subjected to discrimination because of her carpal tunnel syndrome; (2) she was subjected to a sexually hostile work environment; and (3) she was subjected to retaliation as a result of her complaints of sexual harassment. The government also moved for summary judgment on Lazcano's claim of disparate treatment based on gender. Lazcano's opposition was silent with respect to any claim of disparate treatment, so this order deems that issue abandoned. Summary judgment as to that claim is appropriate.

**1.    DISABILITY DISCRIMINATION.**

Under the Rehabilitation Act of 1973, a plaintiff must establish that she is, among other things: (1) an individual with a disability, (2) otherwise qualified, and (3) subjected to discrimination solely by reason of the disability. *See Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1174 (9th Cir. 1998) (citing 29 U.S.C. 794(a)). The government's sole contention regarding Lazcano's claim of disability discrimination is that Lazcano was not "qualified" for

6

1  the position of letter carrier. In the government's view, a letter carrier must, at a minimum, case
2  and deliver mail. Accordingly, because Lazcano could not case and deliver mail, she could not
3  have been discriminated against under the Rehabilitation Act because she was unable to
4  perform those essential functions.

5  Under the Rehabilitation Act, a "qualified individual" is an individual with a disability
6  "who, with or without reasonable accommodation, can perform the essential functions of [the]
7  position." 29 C.F.R. 1630.2(m). Essential functions are "fundamental duties of the relevant
8  position." *Mustafa*, 157 F.3d at 1174 (citing 29 C.F.R. 1630.2(n)(1)). The USPS's "position
9  description" for a letter carrier has two sections relevant to the instant issue: "functional
10 purpose" and "duties and responsibilities." A letter carrier's functional purpose is described as:
11 "Delivers and collects mail on foot or by vehicle under varying conditions in a prescribed area
12 within a city. Maintains pleasant and effective public relations with route customers and others,
13 requiring a general familiarity with postal laws, regulations, and procedures commonly used,
14 and with the geography of the city" (Gibbs Decl. Exh. 1). Two postal employees' declarations
15 state that the main duties of a letter carrier involve casing mail and delivering mail. As stated,
16 casing mail involves sorting the mail, grouping it, and preparing it for delivery. Delivering mail
17 generally involves loading the mail on vehicles and driving to locations where the mail is
18 dropped off to the addressee (Shelton Decl. ¶ 2; Gibbs Decl. ¶ 2).

19 Lazcano focuses on the eleven "duties and responsibilities" of a letter carrier. Those
20 duties range from "[r]outes or cases all classes of mail in sequence of delivery along an
21 established route," to "[r]eports to supervisor all unusual incidents or conditions relating to mail
22 delivery, including condition of street letter boxes and timecards" (Gibbs Decl. Exh. 1).
23 Lazcano contends that she could at least partly perform nine out of those eleven duties. For
24 example, she could rearrange and relabel cases; sort mail to be forwarded for handling by
25 clerks; accept letters for mailing from customers; deliver and collect charges on customs,
26 postage-dues, and C.O.D. mail, deposit mail collected in the post office; and perform several
27 other responsibilities (Lazcano Decl. ¶ 48). Thus Lazcano contends, she could have performed
28 the "essential functions" of a letter carrier.

7

1    This order finds that Lazcano has presented enough facts to create a triable issue
2 whether she was able to perform the essential functions of a letter carrier. "A highly
3 fact-specific inquiry is necessary to determine what a particular job's essential functions are."
4 *Cripe v. City of San Jose*, 261 F.3d 877, 888 n.12 (9th Cir. 2001). Although consideration is
5 given to the employer's view as to the essential job functions, this order cannot conclusively
6 decide whether casing and delivering mail were essential job functions. *Morton v. United*
7 *Parcel Serv., Inc.*, 272 F.3d 1249, 1255 (9th Cir. 2001). The government's assertion that
8 delivering mail and casing mail were essential job functions "does not qualify as an undisputed
9 statement of fact in the context of a motion for summary judgment." *See Mustafa*, 157 F.3d at
10 1175 n.6. Lazcano was employed by the USPS as a "modified city carrier" for many years and
11 allowed to perform functions other than delivering and casing mail. This constitutes some
12 evidence that delivering and casing mail were not essential job functions for carriers. Lazcano
13 has at least raised a genuine issue of material fact whether she was otherwise qualified under the
14 Rehabilitation Act

15    **2.    HOSTILE WORK ENVIRONMENT.**

16    Plaintiff also makes a sexual-harassment claim on a hostile work-environment theory.
17 An employer is liable for conduct giving rise to a hostile work environment if the employee can
18 show: (1) she was subjected to verbal or physical conduct of a harassing nature; (2) that the
19 conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter
20 the conditions of the victim's employment and create an intimidating, hostile, offensive, or
21 abusive working environment. *See Pavon v. Swift Transp. Co.*, 192 F.3d 902, 908 (9th Cir.
22 1999). The severity of harassment should be judged from the perspective of a reasonable
23 person in the plaintiff's position, considering "all the circumstances." *Oncale v. Sundowner*
24 *Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Factors that may be considered "may include the
25 frequency of the discriminatory conduct; its severity; whether it is physically threatening or
26 humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an
27 employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

28

Plaintiff has presented more than sufficient evidence to create a triable issue of material fact whether the government should be liable for a hostile work environment. Boster's alleged behavior clearly involved more than "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Boster frequently verbally harassed Lazcano and touched her inappropriately. Drawing all reasonable inferences in Lazcano's favor, Boster's conduct was sufficiently severe and pervasive to alter the conditions of her environment. A reasonable jury could find that such behavior interfered with Lazcano's work performance.

A decision relied on by the government, *Kortan v. California Youth Authority*, 217 F.3d 1104, 1109–11 (9th Cir. 2000), is inapposite. In *Kortan*, the Ninth Circuit affirmed a district court's grant of summary judgment on a hostile work-environment claim. In *Kortan*, however, the Ninth Circuit held that although the supervisor's comments were offensive, the "difficulty [was] that they were mainly made in a flurry on [one day]." The Ninth Circuit held that the comments were too concentrated and accordingly, that there was no triable issue whether "the conduct was frequent, severe or abusive enough to interfere unreasonably with [the plaintiff's] employment." *Id.* at 1111. There is no similar problem here. Boster's alleged inappropriate conduct occurred for many months following his appointment as postmaster in the El Cerrito Post Office. *Kortan* is distinguishable.

Next, the government argues that the *Ellerth* affirmative defense should preclude Lazcano's hostile work-environment claim. The *Ellerth* defense applies if no tangible employment action was taken against the employee. Pursuant to *Ellerth*, an employer cannot be held liable if: (1) the employer exercised reasonable care to prevent and promptly correct any sexually-harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).[1]

---

[1] The *Ellerth* defense is unavailable to an employer when there is a tangible employment action taken by the employer against the employee. Lazcano contends that a tangible employment action occurred when Boster's harassment caused her to miss work. This order holds that Lazcano's missed time is not a tangible employment action along the lines of a discharge, demotion, undesirable reassignment, or any other decision

9

1   The government contends that reasonable efforts were made to prevent sexual
2   harassment. The government points out that the USPS employed counselors and investigators
3   to check into complaints of discrimination. The government also suggests that reasonable care
4   was demonstrated because Shelton began an investigation when Lazcano brought the alleged
5   harassment to Shelton's attention (Reply Br. 8).

6   Although these facts lean in the government's favor, they are insufficient to decide as a
7   matter of law that the USPS exercised reasonable care. On February 20, 2004, when Lazcano
8   told Shelton about Boster's behavior, Shelton asked if Lazcano had kept any notes of the
9   interactions with Boster. Lazcano said that she had kept notes, and that they could be provided.
10  The next meeting between Lazcano and Shelton was supposed to be held on February 24.
11  Lazcano, however, left early that day for medical reasons and could not meet with Shelton.
12  According to Lazcano, Shelton never asked for the notes again. Drawing reasonable inferences
13  in Lazcano's favor, Shelton's failure to request the notes after February 24 could have been
14  unreasonable (Shelton Decl. ¶ 6; Lazcano Decl. ¶ 42).

15  Similarly, this order cannot find as a matter of law that plaintiff unreasonably failed to
16  take advantage of corrective measures provided by the USPS. The government points out that
17  Lazcano waited several months before informing any of her supervisors about Boster's alleged
18  harassment. But this delay does not establish as a matter of law that Lazcano unreasonably
19  failed to take advantage of corrective opportunities. There are material issues of triable fact as
20  to the availability of the *Ellerth* defense.

21  **3.   RETALIATION.**

22  **A.   *Prima Facie* Case.**

23  For a retaliation claim, a plaintiff must first establish a *prima facie* case: (1) she was
24  engaged or was engaging in activity protected under Title VII; (2) the defendant subjected her
25  to an adverse employment decision; and (3) there was a causal link between the protected
26  activity and the defendant's action. *Johnston v. Horne*, 875 F.2d 1415, 1421 (9th Cir. 1989),

---

28  "causing a significant change in benefits." *Ellerth*, 524 U.S. at 765. Because here no tangible employment action was taken, the *Ellerth* defense is not unavailable *per se* to the government.

10

*overruled on other grounds as recognized by Williams-Scaife v. Dept. of Defense Dependent Schs.*, 925 F.2d 346, 348 (9th Cir. 2001). In Lazcano's opposition, she asserts that she engaged in protected activity when she made a sexual-harassment complaint to Shelton on February 20, 2004 (Opp. 19). This order agrees that her sexual-harassment complaint was protected activity. Lazcano next contends that she suffered three adverse employment actions. *First*, in May 2004, she was accused of stealing $46,978.45 from the vending machines. *Second*, she was confined in the break room in June 2004 without work assignments and without contact with co-workers. *Third*, management attempted to make her change crafts (Opp. 20–21). For purposes of the instant motion, the government does not question whether these three events were adverse employment actions (Reply Br. 10).

The government does contend, however, that Lazcano has not established a *prima facie* case because she has not adequately alleged that a causal link existed between her sexual-harassment complaint and the adverse employment actions. *First*, with respect to the allegation that Lazcano stole money from the vending machine, the government points out that Boster requested the audit of the machines in November 2003. Accordingly, the government contends, because Lazcano first complained of Boster's harassment in February 2004, the protected activity did not "cause" the adverse employment action. This order disagrees. Although the audit may have been initiated in November 2003, Lazcano was first made aware of the audit in March 2004, less than two weeks after she alerted Shelton to the alleged harassment. Lazcano was served with the $46,978.45 demand letter in May 2004, three months *after* she engaged in protected activity (Lazcano Decl. ¶¶ 58–59). Thus, this particular adverse employment action — the accusation that she stole money from the vending machines — did not actually occur until after she engaged in the protected activity. There indeed may have been a causal link between the protected activity and this adverse employment action.

*Second*, the government also contends that there is no causal link between Lazcano's placement in the break room and her sexual harassment complaint against Boster. It is true, as the government points out, that a plaintiff must show "but for" causation to establish retaliation. *See Villarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064–65 (9th Cir. 2002). The Ninth

11

Circuit has held, however, that causation may be inferred from the "proximity in time between the protected action and the allegedly retaliatory employment decision." *See Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000). And, although a "specific time period cannot be a mechanically applied criterion," the Ninth Circuit has held that "[d]epending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation." *Coszalter v. City of Salem*, 320 F.3d 968, 977–78 (9th Cir. 2003).

In this case, Lazcano complained about Boster's conduct in February 2004 and was sent to the break room in June 2004. This order cannot hold as a matter of law that this three- to four-month period was insufficient to establish a causal link between the protected activity and the adverse employment decision. There is at least a triable issue of fact as to Lazcano's *prima facie* case of retaliation.

**B.     Legitimate, Nondiscriminatory Reasons and Pretext.**

Under the burden-shifting scheme of Title VII, after the plaintiff establishes a prima facie case of retaliation, "the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the adverse employment action." *Winarto v. Toshiba Am. Elec. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001). If the employer rebuts the inference if retaliation, the burden then shifts back to the plaintiff to show that the defendant's explanation is merely a pretext for impermissible retaliation. Pretext may be shown either: (1) directly by persuading the jury that a discriminatory motive more likely than not motivated the employer or (2) indirectly by showing that the employer's proffered explanation is unworthy of credence. *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1115 (9th Cir. 2003).

Because Lazcano has met her burden with respect to the *prima facie* case, the government must now proffer reasons for accusing Lazcano of mismanaging the vending machines and for confining her in the break room. The government has satisfied this burden. *First*, a surprise audit of the vending machines to determine whether USPS funds were accounted for is legitimate and nondiscriminatory. If funds were indeed missing, an accusation directed at the alleged perpetrator would be warranted. *Second*, with respect to Lazcano's assignment to the break room, the government contends that she was put there to prevent a

disruptive presence to other workers. These assertions satisfy the government's burden of producing a legitimate, nondiscriminatory reason for its adverse employment actions.

Because the government has offered legitimate, nondiscriminatory reasons, Lazcano must introduce evidence that those reasons were pretextual. This order holds that there are genuine issues of material fact as to whether the government's reasons were pretextual. When examining pretext, although the inference of discrimination from the *prima facie* case "drops out of the picture," the evidence used in establishing the *prima facie* case may be considered for evaluating pretext. *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1148 (9th Cir. 2006).

As noted above, with respect to the accusation that Lazcano stole money from the vending machines, the timing of the accusation was suspicious. The audit was supposedly initiated by Boster in November 2003 but Lazcano was not told about it until March 2004, only weeks after she first told Shelton about Boster's alleged harassment. *See Hernandez*, 343 F.3d at 1115 (finding "suspicious timing" of termination to be evidence of pretext). Moreover, Lazcano states in her declaration that as of February 12, 2004, she was able to account for $51,686.04, which was her "entire Vending Machine accountability at the Main Office." She was also eventually "cleared of the amount" (Lazcano Decl. ¶¶ 58, 59). The parties' papers do not clarify whether Lazcano was in fact cleared of the charges. Nevertheless, this record warrants a jury determination whether accusing Lazcano of the vending machine shortfall came from a retaliatory motive.

With respect to Lazcano's placement in the break room, Boster had stated repeatedly to Lazcano that she should leave her job at the El Cerrito facility so they could have a relationship. It is possible that by confining her to the break room, Boster was trying to discourage Lazcano enough to constructively force her out of the facility. The government contends that it was Shelton who confined Lazcano to the break room, and that Lazcano has presented no evidence that Shelton believed the confinement was not warranted. But Lazcano has presented some evidence establishing that Shelton and Boster had an "understanding" about Lazcano. For example, on one occasion, Boster called Shelton to say, "[Ms. Lazcano] is late, you know what

to do" (Lazcano ¶ 28).  Lazcano has presented a plausible enough case of pretext to survive summary judgment.

## CONCLUSION

For the reasons stated above, genuine issues of material fact exist as to Lazcano's claims of disability discrimination, hostile work environment, and retaliation.  Accordingly, the government's motion for summary judgment as to those claims is **DENIED**.  Summary judgment is **GRANTED** with respect to the disparate-treatment claim, which was not addressed in the opposition and is therefore considered abandoned.

**IT IS SO ORDERED.**

Dated:  January 4, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE